COMMONWEALTH OF VIRGINIA
### CIRCUIT COURT OF FAIRFAX COUNTY
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
(Press 3, Press 1)

**Inna Bochkova  vs.  Akira Technologies Inc et al.**

**CL-2017-0011557**

**TO:    Akira Technologies Inc**
**Christopher Shiplett, Esq Registered Agent**
**252 N Washington Street**
**Falls Church VA 22046**

### SUMMONS – CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment or decree against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on August 25, 2017.

**JOHN T. FREY, CLERK**

**By:**

**Deputy Clerk**

**Plaintiff's Attorney:   Jeffrey L. Rhodes**

EXHIBIT A

**VIRGINIA:**

*FILED*
*CIVIL INTAKE*
*2017 AUG 21  AH 9: 50*
*JOHN T. FREY*
*CLERK, CIRCUIT COURT*
*FAIRFAX. VA*

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

|  |  |  |
|---|---|---|
| **INNA BOCHKOVA**<br>**22 Avenue at Port Imperial**<br>**Apartment 304**<br>**West New York, NJ  07093** | ) ) ) ) ) | |
| Plaintiff, | ) ) | **2017   11557** |
| **v.** | ) ) ) | Case No. _____ |
| **AKIRA TECHNOLOGIES, INC.**<br>**1747 Pennsylvania Avenue**<br>**Suite 600**<br>**Washington, DC 20006** | ) ) ) ) ) | |
| **Serve:** | ) ) | |
| **Registered Agent**<br>**Christopher Shiplett, Esq.**<br>**252 N. Washington Street**<br>**Falls Church, Virginia 22046** | ) ) ) ) ) ) | |
| **and** | ) ) | |
| **SRINIVAS CHENNAMARAJA**<br>**400 Sugarland Meadow Drive**<br>**Herndon, Virginia 20170** | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, Inna Bochkova ("Bochkova" or "Plaintiff"), by counsel, hereby files this

Complaint against Akira Technologies, Inc., and Srinivas Chennamaraja, individually

(collectively "Defendants") and states in support as follows:

. 1

## NATURE OF THE ACTION

1.       This action arises from promises and agreements by Akira Technologies, Inc., a
government contractor organized as an S-corporation, and Srinivas Chennamaraja, its sole
shareholder, to provide Plaintiff Inna Bochkova a 12.5% stake in the Company in exchange for
her $250,000.00 investment. Based on Defendants' promises, Bochkova invested $250,000.00
in the Company and made loans to the Company. Akira issued a Convertible Promissory Note to
Bochkova, signed by Chennamaraja, which described her investment schedule, the conversion of
Bochkova's investment into Akira stock, and the terms of the parties' relationship after
conversion. Bochkova made her investment payments ahead of schedule, and supplemented
them with over $30,000.00 in additional loans to the Company, yet Defendants refused to
convert her investment into stock. Bochkova recently learned that Defendants' promises and
representations were false when made. As such, Bochkova seeks specific performance of the
promised award of stock, damages for breach of contract and fraudulent inducement, recovery
for Defendants' unjust enrichment/*quantum meruit*, punitive damages, and recovery of her
attorneys' fees and costs.

## PARTIES AND PRELIMINARY ISSUES

2.       Plaintiff Inna Bochkova ("Bochkova") is a resident of the State of New Jersey at
22 Avenue at Port Imperial, Apartment 304, West New York, NJ  07093.

3.       Defendant Akira Technologies, Inc. ("Akira" or the "Company"), is an S-
corporation organized under Virginia law with its principal place of business at 1747
Pennsylvania Avenue, NW, Suite 600, Washington, DC 20002, that operates as a government
contracting Information Technology ("IT") company.

2

4.      Defendant Srinivas Chennamaraja ("Chennamaraja") is a resident of the Commonwealth of Virginia, County of Fairfax, living at 400 Sugarland Meadow Drive, Herndon, Virginia 20170, and is the sole owner of Akira.

5.      Venue is proper under Va. Code Ann. § 8.01-262, because the events complained of took place in Fairfax County, Virginia, Defendants regularly conduct substantial business activity in this jurisdiction, a practical nexus exists with this jurisdiction, and the Convertible Promissory Note at issue specifies this Court as a venue for any action to enforce its terms.

## FACTS

6.      In 2011, Chennamaraja hired Eli Liang ("Liang"), Bochkova's ex-husband, to assist him with growing Akira and to obtain investors for Akira. At that time, upon information and belief, Akira only had $50,000.00 of working capital. Liang had extensive experience in IT development and in growing an IT business.

7.      Liang notified Bochkova of the opportunity to invest in Akira. When Bochkova expressed an interest in investing, Chennamaraja and Akira actively sought Bochkova's investment.

8.      To induce Bochkova to invest, Chennamaraja and Akira promised Bochkova that she would become a shareholder in Akira at a set percentage of the Company's total stock based upon the amount of her investment.

9.      Specifically, Chennamaraja and Akira offered Bochkova 1% of the stock of the Company for every $20,000.00 she invested. Bochkova accepted this offer and agreed to invest $250,000.00, for a total ownership interest of 12.5% of the stock of Akira.

10.     In discussing her potential investment in Akira with Chennamaraja and Liang in April 2011, Bochkova demanded that her stock ownership in Akira be subject to certain terms

3

that she set forth in an e-mail to Chennamaraja and Liang. Among other things, Bochkova insisted that she receive control over at least one seat on Akira's board of directors. Bochkova also insisted that Liang be made the Chief Operating Officer of Akira.

11.     In these discussions, Defendants also proposed receiving an investment from a foreign investor in Akira. Bochkova informed Chennamaraja in an April 26, 2011 e-mail that having a foreign investor would violate Akira's S-corporation status and other regulations. *See* 26 C.F.R §§ 1.1361-1(g) (an S-corporation cannot have a non-resident alien stockholder).

12.     Chennamaraja replied to Bochkova by e-mail, stating,

> I am looking forward to working with you and I am confident that Akira will see a high growth in the immediate future with this investment. We are working on resolving the issue with a foreign resident holding the shares. I and/or Eli will keep you abreast of the situation.

13.     Chennamaraja's response shows that he was aware that the Company's S-corporation status would have to change going forward as a result of a foreign investment.

14.     Akira's counsel, Christopher Shiplett, Esq. ("Shiplett"), incorporated many of the terms of Bochkova's April 26, 2011 e-mail into a Shareholder Agreement and Statement of Corporate Good Governance Principles, and attached them as Exhibits B and C to a Convertible Promissory Note ("Note") to confirm the parties' agreement.

15.     The Shareholder Agreement was intended to document the agreement between Chennamaraja and Bochkova concerning the terms by which each would own stock in Akira, and as such showed that Chennamaraja was himself personally obligated by the provisions of that document and the Note to which it was attached.

16.     In the Note, Bochkova agreed to invest $250,000.00 in exchange for a 12.5% ownership interest in Akira. The only condition precedent to the conversion of Bochkova's Note to 12.5% of the stock of the Company, other than her payment of the investment funds, was

4

Defendants' obligation under the Small Business Administration ("SBA") 8(a) program to effectively seek SBA approval of Bochkova's 12.5% ownership interest by submitting and pursuing a change of ownership request. *See* Note attached as Exhibit 1 hereto, ¶¶ 3,4,7.

17.    Akira's obligation to obtain approval from the SBA concerning Bochkova's 12.5% ownership interest was stated in Paragraph 3, 4 and 7 of the Note as follows:

> 3.    Intent To Convert – The parties intend to convert the value represented in this note into an equity share of Akira. However, Akira is registered with the Small Business Administration as an 8(a) minority owned business. To maintain its status as a registered 8(a) business, Akira must submit any potential changes in ownership of the company to the U.S. Small business Administration (the "SBA") for approval of the proposed ownership structure prior to creating such structure.

> 4.    Ownership Change Request – Therefore, Akira shall, as soon as is practicable after the execution of this note and the accompanying funding agreement, prepare and submit a proposed ownership change request to the SBA. The change request will propose Lender ownership of Akira equal to 12.5% of total outstanding shares.

> 7.    SBA Denial - If the SBA denies the ownership change request, the parties shall decide together whether to appeal the denial. If the SBA denies the ownership change request, the loan matures fifteen months from the date of Akira's signature below.

Exhibit 1 at 2, ¶¶ 3, 4, 7.

18.    These provisions, as drafted by Defendants, stated that the parties "intend to convert the value represented in this note into an equity share of Akira" and did not give Akira discretion as to whether or not to submit a proposed ownership change request to the SBA.

19.    Upon SBA approval of the ownership change request, the Defendants and Bochkova were required to formalize and document Bochkova's ownership of 12.5% of Akira stock by: (i) their execution of the Shareholder Agreement attached as Exhibit B to the Note; and (ii) by Defendants' execution of the Statement of Corporate Good Governance Principles attached as Exhibit C to the Note. *See* Exhibit 1, ¶ 6.

20. Chennamaraja signed the Note on May 24, 2011, and Bochkova signed the Note on June 1, 2011.

21. Chennamaraja signed the Statement of Corporate Good Governance Principals on August 4, 2011 without awaiting SBA approval of an ownership change request.

22. On August 4, 2011, Chennamaraja and Akira also signed a similar convertible promissory note to confirm the investment of a foreign national.

23. Chennamaraja and Akira promised 2.5% of the stock of the Company to Oksana Mikhaleva ("Mikhaleva"), based on a $50,000.00 investment through her company, KSV Investment Management (U.K.) Ltd. ("KSV"). On information and belief, Mikhaleva is a Russian citizen and not a U.S. resident, and paid her investment to Liang's current wife, Anna Kuznetsova, in Russia in 2011.

24. Although Bochkova was not privy to Defendants' communications with the SBA after signing her Note, Bochkova filed a Freedom of Information Act ("FOIA") request with the SBA through counsel in October 2016. In response, in December 2016, the SBA produced over 300 documents to Bochkova. Through these documents, Bochkova learned that:

a. In or about August 2011, Akira described Bochkova to the SBA as follows:

Description of type of worker: *future owner (Inna Bochkova is not an owner at the present time – her ownership is only at a future time, and then only if her promissory note is treated as a CONVERTIBLE DEBENTURE as converted to stockholding in the corporation upon approval by the SBA 8(a) Program)*, **unpaid, not in payroll.**

b. In an October 1, 2011 e-mail to Terri D. Brown, an SBA HUBZone Program Analyst, Chennamaraja described Bochkova's Note as follows:

This note is strictly written to be a loan to the company. . . . Only if the SBA approves a future change of ownership request does the promissory

6

note convert into anything else. As long as we have not filed such a request or the SBA has not approved it, it remains quietly a promissory note.

c.  At or about that same time, Akira submitted a document to the SBA

stating that:

There is a future stock transaction which is being proposed to the SBA 8(a) Program *(in separate filings by the corporation with the SBA 8(a) Program)*. In this proposed future stock transaction, there is one person, Inna Bochkova, who currently holds a promissory note issued by the corporation. If the SBA 8(a) Program approves her to be a shareholder of the corporation from the perspective of the SBA 8(a) Program, and only if the SBA 8(a) Program gives such approval, then her loan to the company *(and the associated promissory note)* can be converted to a 12.5% of the company *(in this way her promissory note could be considered a CONVERTIBLE DEBENTURE if the SBA approves her to become a shareholder for the purposes of the SBA 8(a) Program)*.

d.  In an August 4, 2011 HUBZone Initial Application Form SBA submitted

the same day Akira signed a convertible promissory note with KSV, a U.K. company,

Akira represented as follows:

Does the applicant concern have any outstanding convertible debentures? YES

Are all debenture holders, U.S. Citizens?  YES

25.    These deceptive communications to the SBA by Defendants, hidden from

Bochkova, reveal their intention never to convert her Note to equity at the time that she signed

the Note and while she was making investment payments to Akira in performing its terms.

26.    Among other things, these communications wrongfully assert that Defendants

were not obliged to convert the Note into stock because Akira could decide, in its sole discretion,

not to submit a change of ownership request to the SBA, or because the SBA could legitimately

deny approval of such a request. Neither Chennamaraja nor Akira ever made such

representations to Bochkova.

7

27.     Rather, from 2011 through 2015, Chennamaraja and Akira, through

Chennamaraja, Liang, Shiplett, and others, made numerous representations to Bochkova that

they were seeking SBA approval to convert her Note to equity, but that the SBA was delaying

approval.

28.     Defendants thus induced Bochkova to invest in Akira based on representations

that they knew were untrue, including the representation that the "parties intend to convert the

value represented in this note into an equity share of Akira." *See* Exhibit 1, ¶ 3.

29.     Moreover, Defendants' representations to the SBA concerning the investment by

Mikhaleva/KSV show that Defendants never had any intention to convert the investments by

either Bochkova or Mikhaleva/KSV to stock in the Company.  Defendants misrepresented that

all "debenture holders" were U.S. citizens, when neither Mikhaleva nor KSV were citizens of the

United States, and could not be converted into stockholders of an S-corporation.

30.     Under Exhibit A of the Note, Bochkova's investments were scheduled to begin on

the date of her signature of the Note on June 1, 2011, and continue with a payment each month

from September 2011 through January 2012.  In fact, Bochkova paid the full $250,000.00

investment amount required by the Note even before the dates required in Exhibit A of the Note

because Akira told her that it was running low on cash in the summer of 2011.  To enable Akira

to continue operating, Bochkova paid her investment payments early, completing all payments

by the beginning of October 2011.

31.     After completing her $250,000.00 investment in the Company, Bochkova

continually inquired with Chennamaraja, Shiplett, and others at Akira as to when her investment

would be converted to 12.5% of the stock of the Company in accordance with the Note.

8.

32.    In an investor PowerPoint presentation e-mailed to Bochkova on or about August 18, 2012, Chennamaraja and Akira represented to Bochkova that they were:

> Waiting for approval from SBA; Instructed our lawyer to contact SBA.

33.    In numerous acts and communications, Defendants Chennamaraja and Akira repeatedly acknowledged their continuing contractual duties to submit an ownership change request to the SBA while Akira remained in the SBA program, and to convert the Note to equity. Defendants Chennamaraja and Akira acknowledged that these duties continued after fifteen months from the date of Akira's signature of the Note.

34.    For example, on January 7, 2013, Chennamaraja copied Bochkova on an e-mail to Liang in which he stated:

> Eli, I left numerous voice mails to the SBA BD specialist. I am bit frustrated with their lack of response. Can you try calling him.

35.    On March 25, 2013, Chennamaraja copied Bochkova on an e-mail to Shiplett in which he stated:

> Chris,
> I talked to George Carlisle (from SBA). He wants us to re-submit the papers since they lost the paper work. I told him that SBA assigned 3 different SBA specialists to Akira in one year. He said once we submit, he will get on it.
>
> can you prepare the paperwork?

36.    On June 5, 2013, Shiplett e-mailed Bochkova that:

> Because of circumstances beyond your control and beyond Akira's control, specifically the gross incompetence of the SBA in processing the change of ownership paperwork, the contingency on which the option to convert the loan to equity rests remains an unresolved contingency.

9

37.     During that same time frame, Bochkova expressed to Akira and its

representatives, including Chennamaraja, Liang, and Shiplett, her concerns about their failure to

convert her Note to stock in the Company.

38.     On January 9, 2014, Bochkova made additional loans to Akira, care of Liang,

purportedly to meet certain operating expenses of the Company, including a payment to

compensate a contractor to Akira. The loans that Bochkova made on Akira's behalf on or about

January 9, 2014 totaled $30,000.00, and were to be repaid by no later than September 30, 2014.

At that time, Liang had recently repaid the $1,800.00 that Bochkova had previously loaned to

Akira on behalf of their USAID proposal.

39.     Bochkova also made personal loans to Liang at that same time in the amount of

$35,000.00, which were due to be repaid by December 31, 2015.

40.     In exchange for these loans, Liang prepared and tendered to Bochkova a notarized

document promising her that:

> if anything should happen so that Inna Bochkova does not receive the promised
> shares in Akira for which Inna Bochkova had agreed to the convertible loan for
> $250,000 earlier to Akira Technologies, then I will give to Inna the same number
> of shares that she would not be receiving from Akira Technologies from my own
> shares in Akira Technologies.

*See* January 9, 2014 document attached as Exhibit 2 hereto.

41.     As of this date, $22,400.00 of the $30,000.00 Bochkova loaned to Liang on behalf

of Akira on or about January 9, 2014 remains outstanding and unpaid to Bochkova by Akira.

42.     At an investor presentation on January 30, 2014, Akira represented in writing to

Bochkova concerning "Change of Ownership" that Akira was "Waiting for Approval from

SBA."

43.     In that same investor presentation, however, Akira further represented that:

10

— We are only waiting on SBA approval for change of ownership because we are in the SBA 8(a) Program and this is required of Program participants *(change of ownership does not affect our SBA HUBZone status).*

— However, we formally exit the 8(a) Program on November 7, 2015.

— On November 1, 2014 we will file our last annual report for the SBA 8(a) program in which we disclose ownership.

— Change of Ownership after the November 1, 2014 filing will go unreported to SBA.

— Chris's idea:  Wait until November 1, 2014, file our last annual report, and then sign the documents to give Inna and Oxana all their shares regardless of SBA approval status.

44.    The final representation in the "Change of Ownership" section of the January 30, 2014 investor presentation was false in promising to tender shares to "Inna and Oxana" and evidences Akira's fraudulent intent.

45.    Contrary to that representation, the August 4, 2011 Initial Application Form to the SBA shows that Akira had never informed the SBA of the investment by "Oxana" (Mikhaleva/KSV), and that Akira and Chennamaraja never took any action to convert Mikhaleva to shareholder status. In that document, submitted the same day Defendants signed a convertible promissory note with KSV, Akira represented that all of its debenture holders were U.S. citizens.

46.    Moreover, despite its representations in the January 30, 2014 investor presentation, after November 1, 2014, neither Akira nor any of its representatives took the actions described therein to convert Bochkova to equity.

47.    Bochkova continued to inquire concerning her ownership status and the conversion of her Note to equity, only to be continually delayed and avoided by Akira and its representatives, including Chennamaraja.

11

48.     On January 24, 2015, Bochkova requested financials of Akira from Chennamaraja.

49.     On February 3, 2015, Bochkova asked Liang to confirm Akira's ownership structure. Liang confirmed that Bochkova was still entitled to 12.5% of the Company.

50.     In early October 2015, Bochkova contacted Chennamaraja and Liang repeatedly to ask for the financials of the Company, the business plans of the Company, and shareholder dividends and distributions.

51.     After Bochkova made two unanswered e-mail inquiries in October 2015, Chennamaraja wrote Bochkova back and stated that he was in the process of divesting Akira's Value-Added Reseller ("VAR") business and that part of the proceeds would go toward distributions and the rest toward investment in Company growth. Chennamaraja had initiated these divesture discussions without previously consulting Bochkova, contrary to his prior representations and contractual commitments.

52.     In an October 15, 2015 reply e-mail, Bochkova asked to be kept informed of developments concerning the divesture, and Chennamaraja agreed to keep her informed.

53.     In November 2015, Chennamaraja continued to represent that a sale of the VAR business was imminent.

54.     On January 11, 2016, Bochkova e-mailed Chennamaraja and stated, "Shrini, Could you please let me know when should I expect share conversion documents and if there had been any progress with investment bankers." Bochkova forwarded the e-mail to Chennamaraja and Liang again on January 13, 2016, and January 20, 2016.

55.     On January 21, 2016, Bochkova e-mailed Chennamaraja and Liang and stated:

> I am getting quite uncomfortable not having my shares converted by now
> after so many years. Could you please update me on the status and let me

12

> know when this will be done. I would like to see all the financials as well
> before the deal with investment bankers happen.

56. On January 23, 2016, Chennamaraja replied by e-mail to Bochkova and Liang:

> Inna,
> My goal is to get you formalized document to convert the debt (your loan)
> to shares. been going and back with the legal to final[i]ze it. Please be
> patient and I will get this done as soon as possible...

57. Bochkova continued to ask when she was going to be converted to shares and

sought further confirmation of her 12.5% ownership interest in late January and February 2016.

58. On February 16, 2016, Chennamaraja again confirmed to Bochkova regarding

conversion that "I will try to get it done" but stated that he was busy at that time trying to create

a subsidiary for the VAR business.

59. On or about February 21, 2016, Bochkova e-mailed Shiplett and asked him when

she should expect to receive the share conversion documents. Shiplett replied by e-mail on

February 22, 2016, stating that he would have to be in touch with Chennamaraja and Liang and

get back to her.

60. That same day, Bochkova forwarded Shiplett's e-mail response to Chennamaraja

and Liang and stated:

> Shrini, Eli,
>
> I am a bit puzzled about the response below. From all the conversations
> we were having for last many months I understood that share conversion
> process is in progress. The response below suggests the opposite which is
> one big re[d] flag for me. As I have mentioned Shrini, I will be leaving
> the country next week and would like my shares converted asap. I am
> incredibly uncomfortable waiting any longer to get my shares converted.

61. Chennamaraja replied by e-mail that evening:

> Inna,

13

> I have the M&A attorney preparing the docs. He is out and is com[i]ng
> back tomorrow. I am planning to get this done before VA[R] divesture.
> ...

62.     Subsequent events have demonstrated that Chennamaraja's February 22, 2016 e-mail reply was false, and that no documents for such conversion were being prepared at that time.

63.     The next day, Chennamaraja represented to Bochkova by e-mail that the divesture of the VAR business would happen "before May – June timeframe". In a follow up e-mail, he also stated that he was acting as the "CEO/COO/CFO" of Akira.

64.     In May 2016, Bochkova discovered that Chennamaraja hired a new Chief Operating Officer and Chief Financial Officer, Steve Roth ("Roth").

65.     This was contrary to the terms of Bochkova's Shareholder Agreement, attached as Exhibit B to the Note, which stated that Liang would "join Akira as President and COO," and that Bochkova would be informed prior to any top-level management hiring decisions. Exhibit B to Exhibit 1, at 3, ¶ 13.

66.     On behalf of Akira and Chennamaraja, from July 2016 through early October 2016, Roth corresponded with Bochkova about her rights under the Note, and Bochkova continued to insist upon obtaining conversion of her Note to stock.

67.     On July 12, 2016, Roth wrote an e-mail to Bochkova on behalf of Akira and Chennamaraja stating:

> Srini made a copy of your actual agreement available to me so I did have
> the opportunity to review it. ...
>
> After looking at your agreement and hearing the story behind not being
> able to get SBA to approve the issuance of stock to you and our
> subsequent coming out of the 8a program it is no longer necessary to get
> SBA approval for you to become a shareholder.

14

68.    In a September 24, 2016 e-mail to Roth and Chennamaraja, Bochkova reminded

them that, in 2011:

> ... Akira's lawyer, Chris Shiplett, had said that Akira would not remain a
> Subchapter S company because of my investment and Srini and Eli had
> said that before my conversion, the company would convert from
> Subchapter S to a regular C Corp. So these are really some unusual issues
> for me.

69.    In that e-mail, Bochkova also described Chennamaraja's profit from Akira since

2011:

> Since I invested in Akira in May 2011, Srini personally has had 3 types of cash
> flow with respect to Akira. First, he has received his personal salary, which is a
> cash inflow for Srini and a cash outflow for Akira. Second, by law, he has
> received his Subchapter S annual distribution, which is a cash inflow for Srini and
> cash outflow for Akira. And third, he has reinvested his distribution back into
> Akira, which is a cash outflow for Srini and a cash inflow for Akira.
>
> Every year, Srini has been getting the same salary as Eli. I know Eli was at
> $300K/year for about 18 months, then at $200K. So since they are the same, I
> assume means Srini has had total salary of about $1.1M.
>
> Meanwhile, at the end of every year, the company annual earning have flowed
> directly to his tax return as an Subchapter S company since he is a 100% owner.
> So this means that $X million (which is some number over $5M) went to his tax
> return, on which taxes were paid leaving about $5M after taxes which he then
> reinvested in the company since May 2011, which is why our company has
> retained earnings at all.

70.    Chennamaraja replied to Bochkova's September 24, 2016 e-mail that morning,

stating that:

> Akira will remain an S chapter company. That will not change. That's a
> decision I make as the Chairman of the board. At this time, no one owns
> any shares except me, barring You (Inna) deciding to convert your loan to
> a stock.

71.    Chennamaraja ignored the existence of the convertible note held by

Mikhaleva/KSV, which if converted would require Akira to become a C-corporation.

15

72. In a September 26, 2016 e-mail, Roth promised Bochkova that, after conversion,

Akira would pay her dividends to cover any tax obligations of stock ownership:

> Inna, . . . Srini has never taken any money out of the company other than
> to pay the taxes on the company earnings that pass directly to h[i]m. He
> has not taken any distributions other than just enough money to pay the
> tax in the past. This way all of the retained earnings have remained on the
> books to be used by the company for growth. . . . If you convert we would
> do the same for you, we would give you a distribution to pay the tax on
> the portion of earnings that will be passed down to you through a K-1.
> This would be the only distribution that we would agree to at the present
> time and this is different than any distribution we may make to the
> shareholders in the future.

73. When Bochkova continued to insist upon having her Note converted to stock,

Roth insisted to Bochkova that Akira and Chennamaraja would make her guarantee pre-existing

debt of the Company as a condition of converting her Note to stock.

74. Specifically, Roth wrote in an October 4, 2016 e-mail to Bochkova:

> Inna thanks for following up and wanting us to follow through on
> converting your note to shares. There is something that I want to point out
> to you that I was not aware of before this week is that Srini has had to sign
> personally on our loans . . . over the years. We have lines of credit with
> all of these vendors as well as GE/Wells does our LOC/Flooring accounts.
> Since Srini has been 100% owner until now he has been the only one that
> was required to sign, but now that there will be a new shareholder owning
> a 12.5% stake in the company (which is substantial) your guarantee will
> be required as well. I thought you might want to convert so we started the
> process and this is really the only thing that I have found that might be an
> issue for you. Please let us know how you would like to proceed so that
> we can get you the personal guarantee documentation as well as the
> shares. Any questions please let me know? Steve

75. Since October 4, 2016, Akira and Chennamaraja have continued to insist upon

Bochkova agreeing to guarantee pre-existing debt of the Company as a condition of conversion

of her Note to stock, even though no such requirement is stated in the Note or its attachments.

76. The Note and the attachments thereto were a complete and binding contract, not

dependent upon any further negotiation or supplementation of terms.

77. While Defendants clarified certain terms by their subsequent conduct and representations, supported by Bochkova's initial investment and continued forbearance, Defendant had no right to dictate additional or new terms of conversion to Bochkova.

78. Nevertheless, Akira and Chennamaraja refused to perform the Note's terms upon demand by undersigned counsel for Bochkova in late 2016 and early 2017 without requiring that additional or new terms be added to the Note, including Bochkova's guarantee of pre-existing debt of the Company.

79. Since October 4, 2016, Bochkova has been required to incur significant attorneys' fees and costs to seek conversion of her Note to stock. Defendants were aware Bochkova was expending attorney's fees and costs in seeking to obtain conversion of her Note to equity in accordance with its terms.

80. In response to Bochkova's FOIA request, in December 2016, the SBA produced over 300 documents to Bochkova. None of these documents showed any request for approval of a change of ownership by Akira or any of its representatives, including Chennamaraja, Liang, or Shiplett.

81. If Defendants filed any such ownership change request with the SBA, Defendants failed to diligently or adequately pursue a response from the SBA to any such request. Defendant instead voluntarily rendered themselves unable to obtain SBA approval of any ownership change request, and acted in bad faith.

82. In either event, Defendants acknowledged that the condition of seeking SBA approval of an ownership change request prior to conversion of the Note was mooted by Akira's graduation from the 8(a) program.

17

83.     On June 20, 2017, Bochkova, through counsel, demanded that Akira and

Chennamaraja convert her to an equity shareholder in accordance with the terms of her Note, and

compensate her for the attorneys' fees and costs she incurred in pursuing conversion.

Defendants refused to convert Bochkova without precondition.

84.     Bochkova was ready, eager, and willing to become an equity shareholder in

Akira, and had indicated such readiness to Defendants on numerous occasions.

85.     Bochkova seeks to obtain conversion of her Note to equity in the amount of

12.5% of the total stock of the Company. Bochkova has performed all of obligations as required

under the Note, but the Note was not converted to equity due to Defendants' failure and refusal

to do so.

### COUNT I
### SPECIFIC PERFORMACE
### (AGAINST AKIRA AND CHENNAMARAJA)

86.     Bochkova restates and incorporates by reference paragraphs 1-85 of this

Complaint as if set forth herein.

87.     In the Note, Defendants agreed to convert Bochkova's investment of $250,000.00

in Akira into her ownership of 12.5% of all outstanding stock of Akira. Bochkova timely paid

the full $250,000.00 investment called for in the Note and continues to be ready, willing, and

able to perform the terms of the Note.

88.     On September 16, 2016, Akira and Chennamaraja further confirmed through Roth

that they would pay tax distributions on Bochkova's behalf after her Note is converted to 12.5%

of the stock of the Company, without any conditions or qualifications. This confirmation was in

consideration for Bochkova's initial investment in Akira, her outstanding loans to the Company,

and her forbearance in not bringing legal action against Akira and Chennamaraja at that time.

18

89.     Bochkova has demanded that Defendants perform the terms of the Note by tendering to Bochkova 12.5% of the total stock of the Company and by signing the Shareholder Agreement attached as Exhibit B to the Note. Defendants have refused to do so.

90.     Defendants also failed or refused to diligently seek approval of an ownership change request with the SBA. In so doing, at the least Defendants voluntarily rendered themselves unable to convert the Note to stock in the Company, and at most Defendants acted in bad faith. Because Akira graduated from the 8(a) program in December 2015, the condition of SBA approval has become moot, yet Defendants have not converted the Note into stock.

91.     Defendants have also breached their obligations under the Note by: (i) violating the terms of the Shareholder Agreement and Statement of Good Governance Principles concerning corporate management of Akira; and (ii) demanding Bochkova's agreement to additional terms not included in the Note as a condition of conversion of the Note to equity.

92.     Bochkova has no adequate remedy at law to enforce the provisions of the Note other than specific enforcement of the agreement. Akira is a close corporation and stock in the Company cannot be purchased by the general public, and its full value cannot be readily ascertained. The harm to Bochkova cannot be fully or adequately remedied by damages alone.

93.     Bochkova is entitled to specific performance of the terms, conditions, and provisions of the Note, by court decree, among other things, ordering Defendants to convert the Note into equity in the Company by tendering to Bochkova 12.5% of the total stock of the Company and by ordering Defendants to sign the Shareholder Agreement attached as Exhibit B to the Note.

94.     Bochkova is entitled to compensation incidental to a decree of specific performance by virtue of the delay of Defendants in converting the Note to equity in that

19

Bochkova was deprived of her share of cumulative shareholder distributions from the date of her conversion until the present which, according to Company records, equals or exceeds Seventy Thousand Dollars ($70,000.00), plus Bochkova's share of Akira's cumulative shareholder distributions in 2016 and 2017, which have not yet been disclosed to Bochkova.

WHEREFORE, Bochkova prays that this honorable Court enter a decree of specific performance of the Note against Defendants of the terms, conditions, and provisions of the Note, by, among other things, ordering Defendants to:

    (i)    convert the Note into equity in the Company by tendering to Bochkova 12.5% of the total stock of the Company;

    (ii)    sign the Shareholder Agreement (Exhibit B to the Note); and

    (iii)    pay annual tax distributions to Bochkova as a 12.5% shareholder of Akira;

and further award Bochkova:

    (i)    compensation incidental to a decree of specific performance for Defendants' delay in the amount of dividends owed to her by Defendants, jointly and severally, in the amount of Seventy Thousand Dollars ($70,000.00), or such other amount to be proven at trial, plus pre-judgment interest; and

    (ii)    her costs in this matter.

<div align="center">

**COUNT II**
**BREACH OF CONTRACT**
**(AGAINST AKIRA AND CHENNAMARAJA)**

</div>

95.    Bochkova restates and incorporates by reference paragraphs 1-85 of this Complaint as if set forth herein.

96.    In the Note, Defendants agreed to convert Bochkova's investment of $250,000.00 in Akira into her ownership of 12.5% of all outstanding stock of Akira. Bochkova timely paid

<div align="center">20</div>

the full $250,000.00 investment called for in the Note and continues to be ready, willing, and able to perform the terms of the Note.

97.     Bochkova has demanded that Defendants perform the terms of the Note by tendering to Bochkova 12.5% of the total stock of the Company and by signing the Shareholder Agreement attached as Exhibit B to the Note. Defendants have refused to do so.

98.     Defendants also failed or refused to diligently seek approval of an ownership change request with the SBA. In so doing, at the least Defendants voluntarily rendered themselves unable to convert the Note to stock in the Company, and at most Defendants acted in bad faith. Because Akira graduated from the 8(a) program in December 2015, the condition of SBA approval has become moot, yet Defendants have not converted the Note into stock.

99.     Defendants have also breached their obligations under the Note by: (i) violating the terms of the Shareholder Agreement and Statement of Good Governance Principles concerning corporate management of Akira; and (ii) demanding Bochkova's agreement to additional terms not included in the Note as a condition of conversion of the Note to equity.

100.    Defendants' breaches have caused Bochkova significant damages, including the lost value of her investment in Akira in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00), plus interest, the lost value of her outstanding loans to the Company in the amount of Twenty-Two Thousand Four Hundred Dollars ($22,400.00), the lost value of her stock, lost profits and dividends resulting from the failure to convert the Note into stock, lost stock appreciation value, and the loss of the opportunity to participate in any future sale of the Company and/or the Company's stock.

101.    According to Akira's own financial records, Bochkova's 12.5% share of Akira's cumulative net income from 2011 through 2016 equaled One Million Dollars ($1,000,000.00).

21

102.    On information and belief, the current value of Bochkova's right to 12.5% of

Akira's stock, including all profits, dividends, and other rights and benefits of such stock

ownership, equals or exceeds Six Million Seven Hundred Twenty-Five Thousand Dollars

($6.725 Million).

WHEREFORE, Bochkova prays that this honorable Court enter judgment against

Defendants jointly and severally in the amount of $6.725 Million, or such other amount to be

proven at trial, plus pre-judgment interest, and award costs to Bochkova.

## COUNT III
## FRAUDULENT INDUCEMENT
### (AGAINST AKIRA AND CHENNAMARAJA)

103.    Bochkova restates and incorporates by reference paragraphs 1-85 of this

Complaint as if set forth herein.

104.    In the spring and summer of 2011, Akira and Chennamaraja intentionally

misrepresented that they would provide Bochkova with a 12.5% ownership interest in Akira

under terms that she demanded in exchange for her investment in the Company. These

misrepresentations were prior to and/or separate from Akira's contractual obligations, yet were

intended to induce Bochkova to sign the Note on June 1, 2011, and invest $250,000.00 and make

other loans pursuant thereto.

105.    Akira and Chennamaraja never intended to provide Bochkova with a 12.5%

ownership interest in Akira under terms that she demanded in exchange for her investment in the

Company.

106.    Defendants' fraudulent intent not to provide Bochkova with a 12.5% ownership

interest is evident from: (1) Defendants communications with the SBA misstating Akira's

obligations under the Note, including Chennamaraja's e-mail communication to the SBA on

22

October 1, 2011, in which he asserted that Bochkova's Note would never have to be converted if Akira never submitted a change of ownership request to the SBA; (2) The failure of Akira or any of its representatives, including Chennamaraja, to ever submit a change of ownership request to the SBA, and/or failure to diligently pursue a resolution of any such ownership change request; (3) Akira and Chennamaraja's similar failure and refusal to convert a convertible promissory note held by KSV; and (4) Akira and Chennamaraja's failure to convert Akira from an S-corporation to a C-corporation, which demonstrates their refusal to accept the consequences of the required conversion of the convertible debt instruments into stock.

107.   Bochkova was not aware that Akira and Chennamaraja had no intent to perform the terms of their promises when made. Rather, Bochkova reasonably relied on Akira's and Chennamaraja's representations and concealment in investing $250,000.00 in Akira and lending money to Akira in an amount in excess of $30,000.00. Bochkova reasonably expected to receive a 12.5% ownership interest in the form of Akira stock in exchange for her $250,000.00 investment.

108.   Independent of their contractual obligations, from August 2011 to the present, Akira and Chennamaraja made misrepresentations of material facts and concealed material facts with the present intention to mislead Bochkova. These include the existence and status of their submission of an ownership change request to the Small Business Administration.

109.   At no point since April 2011 has Akira or Chennamaraja awarded Bochkova 12.5% of the total stock of Akira.

110.   Akira and Chennamaraja's material misrepresentation and concealment, upon which Bochkova reasonably relied, proximately caused Bochkova to invest $250,000.00 in the

23

Company and to lend the Company an amount in excess of $30,000.00, of which $22,400.00 remains outstanding and unpaid to Bochkova.

111.   Bochkova invested in Akira based on representations by Defendants that Akira would increase in value and be sold for much more than the initial value of her investment. Defendants further represented that they intended to sell Akira for a substantial profit within several years after it graduated from the SBA 8(a) program.

112.   On information and belief, Akira has significantly increased in value. Based on a professional analysis of the relevant financial information, Akira's adjusted average equity value is presently $63.2 Million, rendering a 12.5% interest worth an adjusted average equity value of $7.9 Million were it to be sold right now.

113.   According to Akira's own financial records, Bochkova's 12.5% share of cumulative net income of the Company from 2011 through 2016 was One Million Dollars ($1,000,000.00).

114.   On information and belief, the current value of Bochkova's right to 12.5% of Akira's stock, including all profits, dividends, and other rights and benefits of such stock ownership, equals or exceeds Six Million Seven Hundred Twenty-Five Thousand Dollars ($6.725 Million).

115.   Bochkova suffered an actual loss of $6.725 Million as a result of Akira's and Chennamaraja's fraudulent inducement.

116.   As a result of their conduct, Defendants are liable to Bochkova for punitive damages.

WHEREFORE, Bochkova prays that this honorable Court enter judgment against Defendants jointly and severally in the amount of $6.725 Million, for Defendants' fraudulent

inducement, plus Three Hundred and Fifty Thousand Dollars ($350,000.00) in punitive damages, plus attorneys' fees and costs, and prejudgment interest.

<div align="center">

**COUNT IV**
***QUANTUM MERUIT* and UNJUST ENRICHMENT**
**(AGAINST AKIRA AND CHENNAMARAJA)**

</div>

117.     Bochkova restates and incorporates by reference paragraphs 1-85 of this Complaint as if set forth herein.

118.     Alternatively, by virtue of the monies Bochkova paid to Defendants, Defendants received benefits for which the law implies an obligation to repay Bochkova. Defendants knew that Bochkova was tendering money to them and on their behalf in exchange for stock in the Company, and expected such stock and the benefits of stock ownership in exchange therefor. Such investments, payments, and expenditures benefitted Defendants.

119.     Defendants improperly rejected their obligations under the Note and in their representations to Bochkova, and Defendants have kept Bochkova's payments and used them for their own purposes without providing Bochkova any stock or ownership interest in the Company in response.

120.     Bochkova is entitled to recover from Defendants the sum of $272,400.00, plus interest, which consists of her investment of $250,000.00, plus the sum of her outstanding loans of $22,400.00 to Akira, which represents the funds that Bochkova paid to Defendants.

WHEREFORE, Bochkova prays that this honorable Court enter judgment against Defendants, jointly and severally, in the amount of Two Hundred Seventy-Two Thousand Four Hundred Dollars ($272,400.00), plus applicable interest, and award Bochkova her costs in this action.

<div align="center">

25

</div>

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Date: *August 21, 2017*

Respectfully submitted,

Jeffrey L. Rhodes
VSB No. 44475
Doumar Martin, PLLC
1530 Wilson Boulevard, Suite 430
Arlington, Virginia 22209
Tel: (703) 243-3737
Fax: (703) 524-7610
jrhodes@doumarmartin.com

*Attorney for Plaintiff*

26

## CONVERTIBLE PROMISSORY NOTE

**NEITHER THIS NOTE NOR ANY SHARES OF STOCK TO ISSUE ON THE CONVERSION HEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS. NEITHER THIS NOTE NOR ANY SHARES OF STOCK TO ISSUE ON THE CONVERSION HEREOF MAY BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED OR ENCUMBERED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT WHICH COVERS THIS NOTE OR SUCH SHARES, OR THE DELIVERY OF AN OPINION OF COUNSEL ACCEPTABLE TO AKIRA TECHNOLOGIES, INC. THAT SUCH REGISTRATION IS NOT REQUIRED.**

### AKIRA TECHNOLOGIES, INC.
#### Convertible Promissory Note

**Note No. 1**
**$250,000.00**

This convertible promissory note (the "Note") has been issued pursuant to agreement between Akira Technologies, Inc. ("Akira") and Inna Bochkova ("Investor"). The monies represented in this note shall be disbursed in accordance with the attached Exhibit A.

**Base Terms**

1.  <u>Principal and Maturity</u> - In return for value received, Akira hereby promises to pay to Lender, on demand at any time after the date determined by reference to clause 7 of this agreement (the "Maturity Date"), the principal amount of $250,000.00 and any accrued but at that time unpaid interest.

2.  <u>Interest</u> – Interest on this Note shall be simple interest and accrue at the annual rate of 3.4%, accruing annually. Interest will be payable in full on the Maturity Date. Interest will be payable in cash.

**Conversion and SBA Approval**

3.  <u>Intent To Convert</u> – The parties intend to convert the value represented in this note into an equity share of Akira. However, Akira is registered with the Small Business Administration as an 8(a) minority owned business. To maintain its status as a registered 8(a) business, Akira must submit any potential changes in ownership of the company to the U.S. Small Business Administration (the

Convertible Promissory Note No. 1
Page 1 of 5


EXHIBIT 1

"SBA") for approval of the proposed ownership structure prior to creating such structure.

4.    <u>Ownership Change Request</u> - Therefore, Akira shall, as soon as is practicable after the execution of this note and the accompanying funding agreement, prepare and submit a proposed ownership change request to the SBA. The change request will propose Lender ownership of Akira equal to 12.5% of total outstanding shares.

5.    <u>Lender Cooperation</u> - Lender shall cooperate with Akira's submission by providing all required documentation to Akira for submission to the SBA, and performing such other actions as may be required to support Akira's ownership change request.

6.    <u>SBA Approval</u> - If the SBA approves the ownership change request, the principal and interest on this note shall immediately convert to stock in Akira equal to 12.5% total outstanding stock. Both parties shall take such steps as required to formalize and document such ownership as soon as is practicable after notification by the SBA of the ownership change approval. Specifically, the parties shall execute the Shareholder Agreement attached as Exhibit B, and Akira shall execute the Statement of Principles attached as Exhibit C. The parties shall additionally take such other actions as required to formalize Lender's ownership interest in Akira.

7.    <u>SBA Denial</u> - If the SBA denies the ownership change request, the parties shall decide together whether to appeal the denial. If the SBA denies the ownership change request, the loan matures fifteen months from the date of Akira's signature below.

**Prepayment, Security and Default**

8.    <u>Prepayment</u> - This note may not be prepaid.

9.    <u>Security</u> - This note is unsecured.

10.    <u>Default</u> - Failure of Akira to pay principal or interest due under this note at the time due, which failure is not cured by payment in full of the amount due within thirty days from the date Akira receives notice of the occurrence of such failure shall constitute an event of default.

**Additional Governing Terms**

11.    Neither party may assign any right of this note or delegate any duty of this note without the prior written consent of the other party. Any purported

Convertible Promissory Note No. 1
Page 2 of 5



assignment of rights or delegation of duties is void.

12.     The laws of the Commonwealth of Virginia, without giving effect to the principals of conflict of laws, govern all matters arising under this agreement, including all tort claims.

13.     Any party commencing any legal proceeding, including any tort claim, arising out of this agreement may bring that proceeding in the United States District Court for the Eastern District of Virginia or any court of the Commonwealth of Virginia sitting in Fairfax County, Virginia. Each party hereby submits to the nonexclusive jurisdiction of those courts for purposes of any such proceeding. Each party hereby waives any claim that a legal proceeding brought in accordance with this section has been brought in an inconvenient forum or that the venue of the proceeding is improper.



Convertible Promissory Note No. 1
Page 3 of 5

By: _____

Name:   Srinivas Chennamaraja

Title:   President and CEO

For: AKIRA TECHNOLOGIES, INC.

Date: ___05__/_24_/_2011_

Eric Otero

_____   5-24-2011

```
ERIC ANTONIO OTERO
Notary Public
Commonwealth of Virginia
7172430
My Commission Expires May 31, 2012
```

Signed: _____

Name:   Inna Bochkova

Date: ___06_/_01_/_2011_

Convertible Promissory Note No. 1
Page 4 of 5



### EXHIBIT A
### DISBURSEMENT SCHEDULE

| On execution of this agreement | $156,000.00 |
|---|---|
| 5. Sept. 2011 | $17,000.00 |
| 3. Oct. 2011 | $35,500.00 |
| 7. Nov. 2011 | $22,500.00 |
| 5. Dec. 2011 | $8,500.00 |
| 2. Jan. 2012 | $10,500.00 |

Convertible Promissory Note No. 1
Page 5 of 5

## SHAREHOLDER AGREEMENT

This is an agreement between Akira Technologies, Inc., a Virginia company, ("Akira") and Inna Bochkova (the "Investor").

Akira is an I.T. services company that specializes in providing contract I.T. support, software development support and other related services to the U.S. Federal Government. Akira is registered with the U.S. Small Business Administration (the "SBA") as a member of its 8(a) business development program, which provides extremely valuable opportunities to Akira. Akira seeks capital investment to allow it to continue to expand its operations, but to remain certified as a member of the 8(a) program must allow the SBA to vette and approve any such capital investment if it changes the ownership or control of Akira.

Ms. Bochkova believes Akira presents a favorable business opportunity and wishes to invest in Akira.

The parties therefore agree as follows:

**Base Terms**

1.     <u>Investment in Akira</u> – Investor shall invest pay to Akira $250,000 either as a cash payment or series of cash payments, or in re-categorization of amounts Investor previously loaned to Akira.

2.     <u>Investor Ownership Interest in Akira</u> – In consideration for the payment described above, Akira shall issue shares to Investor, representing an ownership interest of 12.5%.

3.     <u>SBA Approval</u> – So long as Akira remains a registrant in the Small Business Administration 8(a) Business Development program, any term of this agreement that conflicts with an SBA requirement for continued participation in the program shall be void on Akira receiving notice from the SBA of such conflict. Such notice and avoidance of a term will not affect the validity of any other term of this agreement.

**Additional Terms**

4.     <u>Give Back</u> – Investor takes possession of the indicated number of shares immediately on execution of this agreement. However, if Investor fails to provide scheduled investment tranches at the scheduled time, Investor must immediately assign ownership of the number of shares represented by the missed investment and any future scheduled investments to Akira.

5.     <u>Investment Schedule</u> – Investor shall deposit investment tranches into Akira's bank account on the first week of the calendar month, based on the pre-agreed investment schedule.

6.    <u>No Rejection</u> – Akira may not reject the right of Investor to invest according to schedule.

7.    <u>Board of Directors</u> – Investor shall have no more than two seats on Akira's Board of Directors, and the majority owner of Akira shall have no less than three seats on Akira's Board of Directors. There should be one meeting of the Board of Directors every month where the CEO or CFO is required to present the monthly financials and the executives are required to present: (a) the past month's sales, (b) sales perspectives for future months, (c) company staffing level, (d) new hires, (e) company structural changes and improvements, (f) any major future anticipated revenues or major anticipated expenses, (g) performance versus the business plan, (h) any other company business. Unless otherwise stated, board approval is by simple majority.

8.    <u>Board Meetings</u> - Board meetings shall be held on Sunday afternoons and must be scheduled at least 2 weeks in advance so that the Investor may attend. Board meetings should be 2hrs long. Normal board meetings should be by teleconference, but once a quarter, an extended board meeting will be held in NY/NJ where Akira executives may make an extended presentation of current and future business, company direction, etc. Each Board Meeting should be recorded and Akira is responsible for publishing minutes of each Board meeting within 2 weeks of the meeting, and any board resolutions which might have been agreed to.

9.    <u>Independent Auditor</u> -  Akira shall hire an independent auditor to prepare an outside audit of Financial Statements for 2011 (prepared in February or March of 2012). If in any year, Akira exceeds $2.5mm in annual revenue and $300,000 in profits Akira will be required to have the outside auditors go back and audit 2010, 2009, and 2008 as well. If in any year, Akira exceeds $5mm in annual revenue and $600,000, company should also arrange for independent audits of every year before 2008 for which there are adequate financial records to be able to audit (determination to be made in consultation with the auditor).

10.    <u>Accounting</u> – Akira uses QuickBooks now, but must agree to migrate to a more robust Government Contractor accounting system, such as Deltek GCS Premier, even if it is a third-party hosted version of this, when it can afford to do so, or when monthly revenues exceed $250K, whichever comes first.

11.    <u>Audit Committee</u> - There should be an audit committee of the Board of Directors of 3 members and the Investor shall have 2 of the 3 seats on the audit committee. The audit committee should meet once a year and vote to appoint an auditor. The recommended auditor must be ratified by a  majority of the entire board to become Akira's approved auditor. Srinivas Chennamaraja shall be chair of the audit committee, and the committee's role shall be advisory only.

12.     Key Executive Contracts - All key executives of Akira should be officially under written contract to Akira, including the CEO and COO, and such contracts should be for at least the 12 months of the investment and for 12 months afterwards. Neither CEO nor COO shall have the right to leave Akira for 24 months from the time of the first investment, except due to death or disability, so as to insure a continuity care of the investor's asset.

13.     Key Executives - Srinivas Chennamaraja will continue as CEO. Eli Liang will join Akira as President and COO.

14.     Further Capitalization – Investor shall be involved in an advisory capacity in any discussion Akira has concerning further capitalization of Akira, or sale of Akira in whole or in part.

15.     Majority Investor – So as not to imperil company status as a Government contractor, Srinivas Chennamaraja is required to maintain 51% of the outstanding shares of Akira unless otherwise agreed to in writing by the Investor.

16.     Necessary Filings - The CEO is required to inform the board of directors of all necessary filings with the Small Business Administration or any Government agency which are necessary to be made in order to maintain Akira's 8(a) status (and in the future it's HUBZone and DC special status) and the dates on which these filings are necessary, and all of this information must be recorded in written board minutes. Srinivas Chennamaraja is required to make all necessary filings on time, so as not to imperil Akira's special statuses.

17.     Succession Plan - Akira must have a clearly defined and definite succession plan (approved by the Board of Directors) in case of the permanent impairment or death of any of the key company executives, including the CEO and COO.

18.     Prior Legal Review of Contracts - Akira shall ensure that there is prior legal review of every contract/agreement for expenses or revenues or a task order for revenues of an amount greater than $100 million to ensure compliance and to ensure that Akira is not put at risk due to the agreement. This is not necessary if Akira is using a standard form which already has been legally reviewed (for example, for a standard employment agreement). For all such agreements, Akira shall instruct its attorney to identify all compliance issues which Akira is not already complying with, and the board of directors should be notified of all such issues in a board meeting, along with the steps Akira is taking to get into compliance, and these issues should be recorded in board minutes.

19.     Distributions – Akira shall advise all Investor prior to making distributions. Prior to any payment of distributions, Akira must declare to the board of directors the amount of profits, what portion of profits is retained by Akira vs. proposed to be paid out, what the impact of the payout is, if any, on

company finances, and the exact distribution of the payout in dollar amounts to every affected person or investor.

20.   First New Board of Directors Meeting – The first meeting of the new board of directors shall be no more than three and no greater than five weeks after the SBA grants approval of the ownership change, and the date of the first investment.

21.   Corporate Governance Policy -  The CEO shall present a draft of Akira's "Corporate Governance Policy" at the the first board meeting. This policy must contain such things as rules concerning hiring of relatives of company executives or use of vendors who are relatives or controlled by relatives, payments to anyone who is not under employment with the firm and not a contracted vendor, written expense reimbursement policies, etc. Although Akira is not a large business, nonetheless, the policies should borrow heavily from Sarbanes-Oxley 2002 and LRN (www.lrn.com), especially in regard to corporate transparency. That way the Investor are assured of good corporate governance and corporate transparency in all substantive matters. This "Corporate Governance Policy" must be ratified by a simple majority of the members of the board to take effect, and so will future changes in this policy.

22.   Human Resources Policy - The CEO shall be responsible for developing Akira's Human Resources policies and an "Employee Handbook" and must present a draft of this by the second board meeting. This may be ratified, and future changes of the same, by a simple majority of the board members.

23.   Named or Titled Executives - Any named or titled executives of the firm, other than CEO or President and COO, must be presented to the Board of Directors for approval, PRIOR to their appointment. Appointments made prior to board approval are considered invalid. Only the CEO, President and COO, and other approved executives of Akira may sign contracts or agreements committing Akira to anything which makes a financial commitment.

24.   Notice – Each party may send required notices to the other via certified mail, courier, or nationally recognized express delivery service at the following addresses:

   a.   For Akira

   Akira Technologies, Inc.
   Attn: Srinivas Chennamaraja
   4031 University Drive
   Suite 200
   Fairfax, VA 22030

   b.   For Investor

Inna Bochkova

**25.   Entire Agreement** - This agreement constitutes the entire agreement of the parties relating to the subject matter of this agreement and supersedes all other oral or written agreements.

**26.   No Oral Amendment** - No amendment of this agreement will be effective unless it is in writing and signed by the parties. No waiver of nonperformance of an obligation under this agreement will be effective unless it is in writing and signed by the party granting the waiver, and no such waiver will constitute a waiver of nonperformance of any other obligation.

**27.   Severance** - If any provision of this agreement is unenforceable to any extent, the remainder of this agreement, or application of that provision to any circumstances other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

**28.   No Assignment or Delegation** - Neither party may assign any right of this agreement or delegate any duty of this agreement without the prior written consent of the other party. Any purported assignment of rights or delegation of duties is void.

**29.   Choice of Law** - The laws of the Commonwealth of Virginia, without giving effect to principals of conflict of laws govern all matters arising under this agreement, including all tort claims.

**30.   Venue** - Any party commencing any legal proceeding, including any tort claim, arising out of this agreement may bring that proceeding in the United States District Court for the Eastern District of Virginia or any court of the Commonwealth of Virginia sitting in Fairfax County, Virginia. Each party hereby submits to the nonexclusive jurisdiction of those courts for purposes of any such proceeding. Each party hereby waives any claim that a legal proceeding brought in accordance with this section has been brough in an inconvenient forum or that the venue of the proceeding is improper.

By:_____          Signed:_____

Name:   Srinivas Chennamaraja          Name:   Inna Bochkova

Title:   President and CEO          Date:_____

Shareholder Agreement
Page 5 of 6

For: AKIRA TECHNOLOGIES, INC.

Date:______________________________

## AKIRA TECHNOLOGIES, INC. STATEMENT OF GOOD GOVERNANCE PRINCIPLES

Akira Technologies, Inc. ("Akira") is an internet technology and software company that works as a contracted company for the U.S. Federal Government. Akira believes that good governance principals increase shareholder value, increase client value, and contribute to efficient and effective working of the company. Therefore, Akira issues the following statement of good governance principles.

1. The company will create an electronic mailing list for members of the board of directors.

2. The company will create an electronic mailing list for members of the audit committee.

3. Between board meetings, the CEO is responsible for preparing and disseminating to the board members a weekly status report of the company via the board electronic mailing list. This status report will be published every monday morning by noon. It will contain highlights of the previous week which affect current or future revenues or expenses, or the company's current or future prospects, risks, etc.

4. The company is responsible for disseminating to the audit committee mailing list any information concerning the external audit or company financials which the company may publish.

5. The company must maintain a company register of all share transfers, board resolutions and minutes of board meetings which the investors may review at any time. The company will bring the company register to the NY/NJ board meetings for inspection by the investors.

6. The company must maintain a secure website or web location where the investors may sign on at any time and inspect an electronic copy of everything in the company register and the following items: (a) copies of the annual and monthly financials, (b) copies of all contracts and agreements signed by the company which obligate the company to pay monies (including employment agreements, rental agreements, contracts with vendors, etc.), (c) copies of all contracts which result in revenues to the company, (d) copies of the board minutes and weekly status reports, (e) a list of all company active clients with their contact information, and (f) copies of monthly bank statements from all company-held bank accounts. All contracts and agreements in the online repository should be signed and all documents should be neatly organized into folders so the investors can inspect and find documents easily. The investors will be given a means to log in to this system.

7. The investors have the right to inspect the company's books, accounting system, and official company bank statements, at any time, with or without notice.

8. The company commits to applying for CMMI Level 3, ISO 9001, GSA IT-70 and MOBIS schedule, HUBZone status, and all 12 DC preference points, during the first 6 months of the investment.

9. The company commits to retaining National Security Associates Worldwide (NSAWW -- www.nsaww.com) within 3 months of the first investment, so as to insure to the investors that the company has an adequate number of sales leads.

Good Governance Principles
Page 1 of 3

10. The company commits to maintaining its current and prospective customer contacts, partner contacts, and sales pipeline in some CRM system (e.g., Salesforce.com) which the investor has the right of access, at any time, so that the investor is able to check on sales progress and the company's prospective sales pipeline. The investors will be given a means to login to this system.

11. So as to ensure that the company has an adequate number of sales leads, the company commits to actively pursue sales leads and contract work at a minimum of 8 Government agencies including the DC Government during each of the last 9 months of the investment, as reflected by the activity recorded by the CRM.

12. The company executives may not take any actions which might reduce the value of the company or its businesses without consultation with the board of directors, either in a board meeting, or via email. At a minimum, investors are required to assent to any such actions via email.  The company executives are required to clearly explain the actions being proposed and their possible ramifications, both positive and negative. If any investor does not respond within 72 hrs, the company may assume the investor assents to the proposed action.

13. Profits are taken out of the company only by written assent of the investors, and only then through allocations in proportion to the shareholdings of the shareholders. Prior to any payment of profits, the company must declare to the board of directors the amount of profits, what portion is retained by the company vs. proposed to be paid out, what the impact of the payout, if any, is on the company finances, and the exact distribution of the payout in dollar amounts to every affected person or investor.

14. Not withstanding the prior clauses, bonuses or payments (outside of what is explicitly included in an employment agreement or specifically permitted under a written expense policy) to company executives or other employees or subcontractors will be made only by written assent of the investors, and also payments to any relative of a company executive, whether they are employee, vendor, or outside party, including to companies controlled by relatives, will only be made with the written assent of the investors. No payments will be made to any employees or subcontractors prior to the definitive signing of an employee, contractor, or subcontractor agreement. Employees, contractors, or subcontractors of the company may not accrue more than 60 hours prior to the signing of a definitive agreement for employment or services. The investors have the right to block any payment not in accordance with this clause.

15. Without written assent of the investors, payments may only be made to entities and people who have written and signed agreements with the company (such as employees or subcontractors), or for vendors pre-approved by the investor (e.g., telephony, utilities, memberships, subscriptions, etc.). The CEO is required to submit a list of the vendors that require such pre-approval (because they do not have signed contracts) to the board of directors by the first board meeting.

16. The company is required to apply for a bank line of credit and then thereafter, to make all necessary disclosures and perform all necessary actions to maintain this bank line of credit.

Good Governance Principles
Page 2 of 3

17. When the company can afford it, both the CEO and the President and COO should reduce their billability to zero so that they can concentrate on sales and marketing.

18. The CEO and the President and COO agree that they will get all necessary personal professional certifications. in order that the company can properly pursue a knowledge-based service provider strategy. At a minimum, these should include the PMP, PgMP, Six Sigma Blackbelt, EACOE's EA Architect, ITIL Expert, COBIT (ISACA's CGEIT), and IMC Management Consult, although not everyone needs all of these. The certifications and time-frames and schedules, and who will be getting these, should be presented to the board of directors in the first meeting and will be tracked by the board of directors. All personal professional certifications will be paid for and maintained by the individual, not the company. All study and certification time will not be on company time. These certifications will ensure for the investors that the company is indeed structured in a way to be best able to pursue a knowledge-based strategy in consulting services so as to maximize the value of the investors' asset.

By: _____

Name:   Srinivas Chennamaraja

Title:   President and CEO

For: AKIRA TECHNOLOGIES, INC.

Date: _____8 / 4 / 20 / / _____

> **HINA NASIR**
> NOTARY PUBLIC
> COMMONWEALTH OF VIRGINIA
> MY COMMISSION EXPIRES MAY 31, 2013
> COMMISSION # 7283457

08/02/2011

> **HINA NASIR**
> NOTARY PUBLIC
> COMMONWEALTH OF VIRGINIA
> MY COMMISSION EXPIRES MAY 31, 2013
> COMMISSION # 7283457

> **HINA NASIR**
> NOTARY PUBLIC
> COMMONWEALTH OF VIRGINIA
> COMMISSION EXPIRES MAY 31, 2013
> COMMISSION # 7283457

Good Governance Principles
Page 3 of 3

Agreement

On this 9th day of January, 2014, and in exchange for a $30,000.00 personal loan from Inna Bochkova, the value of which I agree is valuable and sufficient, I, Eli Liang, secure this loan with all of my shares (42.5%) in Akira Technologies, Inc. of 10 G Street NE, Suite 710, Washington, DC 20002. In the event that I do not repay the loan by September 30, 2014, Inna Bochkova will have the right to my share in the above-named company.

Furthermore, I agree that if anything should happen so that Inna Bochkova does not receive the promised shares in Akira for which Inna Bochkova had agreed to the convertible loan for $250,000 earlier to Akira Technologies, then I will give to Inna the same number of shares that she will would not be receiving from Akira Technologies from my own shares in Akira Technologies.

I also acknowledge herein that I have received loans of $35,000 from Inna Bochkova which need to be repaid. I agree to repay those by December 31, 2015 or Inna Bochkova will have the right to my share in the above-named company.

Signed:

_____

January 9, 2013

Notarized:

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 9TH DAY OF SAN 2014
BY _____
NOTARY PUBLIC

*(Notary seal: ALI ABDALLAH, NOTARY PUBLIC, Expiration May 31, 2018, DISTRICT OF COLUMBIA)*

EXHIBIT 2